IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,                )                                     )      Plaintiff,                           )                                     )   vs.                                  )           NO. CR 05-1342 RB                                     )   MARCELINO HERRERA-CORREA,      )                                     )      Defendant.                        ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's (Marcelino Herrera-Correa) Motion to Suppress (Doc. 26), filed on October 11, 2005. The Government filed a response and, on December 7, 2005, I heard testimony and argument on this motion. Having considered the submissions, arguments of counsel, and being otherwise fully advised, I deny this motion for the following reasons.

**I. Background**.

Herrera-Correa moved to suppress evidence derived from his March 17, 2005 detention by U.S. Border Patrol along New Mexico State Road (hereinafter "NMSR") 24 near Piñon, New Mexico. Herrera-Correa argues that the stop violated the Fourth Amendment because the officer lacked "reasonable suspicion" to stop the vehicle and, accordingly, all evidence derived from the stop -- specifically, Herrera-Correa's statements to Border Patrol subsequent to his apprehension -- must be suppressed.

Piñon, New Mexico is a small, remote community in Otero County, which is situated southeast of Alamogordo, New Mexico and southwest of Artesia, New Mexico. It is approximately

100 miles, by road, from El Paso, Texas and the Mexican border. NMSR 506 (also known as "Piñon Road" or "Cornucopia Road") is a dirt road that runs from Piñon, south, into Texas; it intersects with NMSR 24 in Piñon and, with Highway 62/180 east of El Paso, Texas. At its point of origin in Texas, Piñon Road is located roughly: (1) 300 yards west of the Highway 62/180 Border Patrol checkpoint; and (2) 30 miles from the Mexican border. The Piñon vicinity is sparsely populated; only a few ranches are situated along Piñon Road and NMSR 24.[1]

On March 17, 2005, U.S. Border Patrol Agent Kenneth Johnson was assigned to patrol the Piñon area because Border Patrol had received substantial intelligence related to increased unlawful alien- and drug-smuggling activity. Between 6:00 a.m. and 8:30 a.m. that day Agent Johnson did not encounter any traffic on Piñon Road. At approximately 8:30 a.m., however, Johnson saw a black, extended-cab, Dodge Dakota pick-up truck, with a camper shell, traveling north on Piñon Road. Johnson estimated the distance between "where [he] first encountered the pickup truck" and the Mexican border to be 60-70 miles. *See* Govt.'s Resp. to Def.'s Mot. to Suppress at ¶4.

Johnson was standing roughly 40 feet off Piñon Road when he first saw the truck. The agent observed that there were at least three people in the truck's cab. Additionally, as it passed his patrol unit -- which was parked along Piñon Road -- the truck appeared to "rev its engine," accelerating

---

[1] NMSR 24 runs east/west through the town of Piñon. To be clear, Piñon Road does not intersect with any paved road between Highway 62/180 and NMSR 24. Several dirt roads, however, do intersect with Piñon Road in New Mexico. Most of these unpaved roads simply connect farms and ranches to the road system.

2

markedly.[2] Johnson ran to his vehicle and immediately drove north on Piñon Road.[3]

The agent caught up to the vehicle after several minutes. Following behind the black truck at a distance of approximately 2-3 car lengths, and at a speed of roughly 30 miles per hour, Johnson observed heads "bobbing up and down" inside the truck's camper shell. *See* Govt.'s Resp. to Def.'s Mot. to Suppress at ¶6. He saw individuals look in his direction and then disappear below his line of sight. Johnson then requested a registration check on the vehicle's license plate number. Border Patrol radio dispatch informed him that the vehicle was registered out of El Paso, Texas to a Marcelino Herrera-Correa.

Johnson decided to detain the vehicle at the intersection with NMSR 24, approximately 15-17 miles to the north.[4] At that time, the agent was aware that: (1) Border Patrol intelligence indicated that alien smugglers were using dirt roads in southcentral New Mexico (including Piñon Road) to avoid the Highway 62/180 Border Patrol checkpoint; (2) Border Patrol agents had apprehended alien smugglers along Piñon Road on prior occasions; (3) roads in the Piñon, New Mexico vicinity are infrequently traveled and that non-local traffic on Piñon Road is highly unusual; (4) no hunting season was open on the date in question; (5) the truck was registered out of El Paso, Texas; and (6) alien smugglers use pick-up trucks with camper shells, similar to the black truck, to transport

---

[2]Johnson testified that when he heard the truck's motor rev it sounded as if the driver had "floored it." On cross-examination, he maintained that the "revving" sound persisted such that the noise was unlikely the sound of a manual transmission changing gears. It is unclear whether the truck driven by Herrera-Correa had a manual or automatic transmission.

[3]It should be noted that, at the time Johnson decided to observe the truck more closely, he was aware that: (1) intelligence reports indicated that, prior to March 17, 2005, alien smugglers were using dirt roads in southcentral New Mexico (including Piñon Road) to avoid El Paso area - more specifically, the Highway 62/180 and Highway 54 -- Border Patrol checkpoints; (2) Border Patrol agents had apprehended alien smugglers along Piñon Road in the past; and (3) the vehicle accelerated when it passed his marked patrol unit.

[4]Johnson did not stop the vehicle at the time for safety reasons. That is, he resolved to initiate an investigatory stop, but chose to wait, because that portion of Piñon Road is quite remote and very poorly marked.

undocumented aliens.

At NMSR 24 Mile Marker 28, Johnson activated his patrol unit's emergency lights and initiated an investigatory *Terry*[5] stop. The agent, approaching the truck from the rear, noticed three persons lying inside the camper shell, and four more persons sitting in the truck's cab. Herrera-Correa, the driver, presented Johnson with a resident alien identification card. The truck's other occupants were undocumented aliens from Mexico.

Johnson proceeded to arrest Herrera-Correa for transporting illegal aliens.[6] Although he was advised of his *Miranda*[7] rights, Herrera-Correa waived his rights.[8] Herrera-Correa stated at the time of his arrest that he: (1) knew that the passengers were illegally in the United States; (2) picked them up near Piñon, New Mexico; and (3) was giving them a ride to Piñon. *See* Govt.'s Resp. to Def.'s Mot. to Suppress at ¶10. As noted *supra*, Herrera-Correa seeks to suppress the *Terry* stop itself, as well as the statements he made to Border Patrol.

**II. Analysis.**

### A. U.S. Border Patrol must have "reasonable suspicion" to initiate a *Terry* stop.

The Fourth Amendment of the United States Constitution proscribes "unreasonable searches and seizures" by the Government. U.S. CONST. amend. IV. These protections extend to

---

[5] *See* Terry v. Ohio, 392 U.S. 1 (1968).

[6] Special Agent Hector Ochoa, also assigned to patrol the Piñon area that day, helped Johnson arrest the truck's occupants. Ochoa, not Johnson, advised Herrera-Correa of his *Miranda* rights. To be clear, Johnson knew that Ochoa was nearby when he decided to stop the vehicle, *see supra* note 4 and accompanying text, because Ochoa had radioed, sometime after Johnson began following the truck, to inform Johnson that he was approaching Piñon.

[7] *See* Miranda v. Arizona, 384 U.S. 436 (1966).

[8] As noted *infra* note 11, Herrera-Correa does not allege that Johnson unlawfully administered the *Miranda* warning to Defendant.

4

investigatory *Terry* stops made by U.S. Border Patrol agents on roving patrol. *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)).

A two-part test is used to assess whether a *Terry* stop violates the Fourth Amendment: (1) the stop must be "'justified at its inception'"; and (2) the agent's conduct in carrying out the stop must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004) (quoting *Terry*, 392 U.S. at 20). Satisfying these requirements necessitates that the Government evidence "'specific and articulable facts which, taken together with rational inferences from those facts,'" gave the Border Patrol agent reason to believe that the "the detainee ha[d] committed or [wa]s about to commit a crime." *Id.* (quoting *Terry*, 392 U.S. at 21). Moreover, the Government must show that, in conducting the investigatory detention, the agent's actions were reasonable in scope. *Id.* Whether an investigatory stop is lawful under this analysis is "judged by an objective standard taking the *totality of the circumstances* and information available to the officers into account." *Id.* (internal citations and quotation marks omitted) (emphasis added).

The following factors are relevant to determining whether an "immigration stop is supported by reasonable suspicion":

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*Gandara-Salinas*, 327 F.3d at 1129-30 (citing *Brignoni-Ponce*, 422 U.S. at 884-85) (additional

citations omitted). An agent may assess these factors in light of his experience and specialized training. Indeed, a court owes deference to an agent's "ability to distinguish between innocent and suspicious actions" and "may not evaluate and reject each factor in isolation." *Id.*

**B.    Agent Johnson had "reasonable suspicion" that Herrera-Correa's vehicle was involved in criminal activity at the time he made the *Terry* stop.**

Herrera-Correa challenges only the validity of the initial *Terry* stop.[9] He argues that Agent Johnson did not have the requisite "reasonable suspicion" to initiate the stop because there were "not enough facts to justify a stop of [Herrera-Correa's] truck." Def.'s Mot. to Suppress at ¶11. Indeed, Herrera-Correa maintains that Johnson's decision to detain the truck was wholly premised on the fact that there were "several people in the truck." *Id*. He argues, therefore, that the agent did not have a "[reasonable] suspicion that the vehicle Defendant was driving contained [undocumented] aliens." *Id*.

Evaluating the facts at bar, however, it is clear that the *Terry* stop did not violate the Fourth Amendment. Johnson clearly had a "reasonable suspicion that the defendant ha[d] committed a crime or [wa]s about to do so." *Johnson*, 364 F.3d at 1188 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). That is, he was "aware of *specific articulable facts*, together with rational inferences from those facts" that indicated that Herrera-Correa's vehicle might have been involved in criminal conduct. *See United States v. Martinez-Cigorroa*, 44 F.3d 908, 910 (10th Cir. 1995) (emphasis added).

Contrary to Herrera-Correa's position -- that is, that Johnson's only basis for suspecting the truck was involved in criminal activity was that several people were in the truck's cab -- the agent was cognizant of several other, arguably suspicious, articulable facts. As noted *supra*, Johnson was

---

[9]Herrera-Correa's motion does not object to the scope of Johnson's subsequent questioning or vehicle search. *See* Def.'s Mot. to Suppress.

aware that: (1) intelligence indicated that, in the days preceding March 17, 2005, alien smugglers had used dirt roads in southcentral New Mexico (including Piñon Road) to avoid Border Patrol checkpoints; (2) Border Patrol agents had apprehended alien smugglers along Piñon Road before; (3) alien smugglers use pickup trucks with camper shells to transport undocumented aliens; (4) individuals were riding inside the truck's camper shell; (5) roads in the Piñon, New Mexico vicinity are lightly traveled; (6) non-local traffic along that portion of Piñon Road is highly unusual generally, and especially so when there is no open hunting season; and that (7) the vehicle was not registered locally, but instead, registered out of El Paso, Texas.

These facts are consistent with Johnson's belief that the truck driven by Herrera-Correa had likely been, or presently was, involved in criminal alien-smuggling activity. Moreover, because "the ultimate assessment of reasonable suspicion depends on the totality of the circumstances," it is not necessary for these facts to independently give rise to "reasonable suspicion." Instead, they must be viewed together in context. *See Gandara-Salinas*, 327 F.3d at 1130 ("law enforcement officer may assess these factors in light of his experience and specialized training").[10]

For instance, while viewed independently, driving a pick-up truck with a camper shell is not suspicious, "a court may not evaluate and reject each [*Brignoni-Ponce*] factor in isolation." *Gandara-Salinas*, 327 F.3d at 1130 (citing *United States v. Arvizu*, 534 U.S. 266, 274-75 (2002)). Not only did Johnson know that trucks with camper shells are popular with traffickers, he heard the truck accelerate as it passed his position along Piñon Road and could see heads inside the camper

---

[10]Here, the conclusion that the *Terry* stop here was lawful is bolstered when Agent Johnson's approximately ten years of experience with the U.S. Border Patrol is considered. *See* Govt.'s Resp. to Def.'s Mot. to Suppress at ¶3. Johnson has been assigned to the Carlsbad, New Mexico Station for more than two years. Prior to the underlying March 17, 2005 incident, the agent had helped apprehend undocumented aliens in southcentral New Mexico and was aware that Border Patrol had apprehended alien-smugglers along the Piñon Road/NMSR 24 route.

shell. Taken together, therefore, it was reasonable for the agent to find the appearance of the truck suspicious. *See United States v. Guillen-Zapata*, No. 05-2119, 2005 WL 3293892, at *5 (10th Cir. Dec. 6, 2005) ("courts should be hesitant to second-guess law enforcement officers' ability to detect suspicious conduct when they possess experience and specialized training in that area").

Likewise, as to the truck's license plates, out-of-state plates are generally "not significantly probative of illegal activity and add[] little to the reasonable suspicion equation." *Martinez-Cigarroa*, 44 F.3d at 911. Yet, the Court of Appeals for the Tenth Circuit has also expressly stated: "that out-of-state license plates may be a relevant consideration in some circumstances." *Id.* Here, given Johnson's familiarity with local traffic patterns, specifically, that Piñon Road is rarely used as a thoroughfare by legitimate, non-local traffic, the truck's Texas license plates was relevant to the agent's "reasonable suspicion" calculus.

Taken together, therefore, the facts show that Agent Johnson had "reasonable suspicion" to believe that criminal activity was afoot when he initiated the *Terry* stop in question. Accordingly, the *Terry* stop was valid and Herrera-Correa's Motion to Suppress is denied.[11]

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

---

[11] Herrera-Correa does not challenge the validity of his *Miranda* waiver. Likewise, there is no indication in the parties' motion papers that his waiver was anything but knowingly and voluntarily given. As such, there appears no cause to suppress Defendant's statements to Agent Johnson at the scene on Fifth Amendment grounds.